WILLIAM ANAGNOSTI *vs.* WILLIAM ALMY & others.

SAME *vs.* SAME.

Suffolk. March 9, 1925. — May 22, 1925.

Present: RUGG, C.J., CROSBY, CARROLL, WAIT, & SANDERSON, JJ.

*Contract,* Construction, Performance and breach. *Equity Pleading and Practice,* Appeal; Master: findings of fact, recommittal. *Equity Jurisdiction,* Accounting.

A contract of employment between a salesman and a cotton broker contained no provision requiring the broker to "hedge" on cotton purchases in order to avoid a loss by reason of over purchases, or to buy or sell in accordance with the advice or approval of the salesman, and provided that all transactions were subject to the broker's approval. The salesman was to share in net profits but he was not to share in losses, and the broker was to finance all transactions. *Held,* that the salesman was not entitled, in an accounting, to a share in a profit which would have been realized if the broker had "hedged" on certain purchases on the advice of the salesman and at his request.

The contract above described provided that net profits should not be payable to the salesman until all contracts relating to the purchase and sale of cotton had been executed and collected by the brokers and until all charges against such sales had been received and all liabilities or guaranties thereon had been liquidated. Nearly two years after the termination of the contract, certain transactions still were incomplete because cotton purchased during the period had not been sold. The salesman demanded an immediate sale. The broker in good faith delayed and, when sale was made a few months later, less profit was realized than if a sale had been made at the time of the salesman's demand. *Held,* that the broker was accountable to the salesman only for the profit actually realized and not for what would have been realized had the salesman's demand been complied with.

Upon an appeal from a final decree in a suit which had been heard by a master, where the evidence was not reported and the judge who ordered the decree entered had drawn from facts found by the master inferences different from those drawn by the master, this court stands with reference to the facts found and the drawing of inferences as did the trial judge, and is not bound either by the inferences and conclusions of fact drawn by the judge or by those drawn by the master.

A salesman made with a cotton broker an oral contract of employment under which he was to receive a certain share of net profits of the broker's foreign business, which the broker was to finance. By reason of employment with another person in which the salesman then was engaged, the parties agreed to put the agreement in writing after that

employment should cease.  The contract in writing later was drawn and was dated as of the date of the termination of the employment with the former employer.  The broker's attorney suggested that the parties have an accounting at once on the transactions preceding that date, "but the parties pointed out that this was not practical at that time because until all of the cotton sold had been delivered and the final payments made and charges and expenses determined, the net profits could not be ascertained, and the matter was dropped with the understanding that the accounting on these transactions would be had when it was convenient and practical for the parties."  Transactions for the period before the date of the contract in writing showed a profit;  those after showed a loss which was so large as to wipe out the profits of the earlier period.  The salesman brought two suits, one for an accounting as to each period.  The suits were heard by a master, upon whose findings of fact and the provisions of the contract in writing and reasonable inferences drawn therefrom, it was *held,* that

(1) The writing did not operate to terminate the oral contract, but served rather as a convenient memorial or record of it, embodying the entire agreement of the parties, to be construed and interpreted, however, in the light of all the circumstances including the terms of the original oral agreement;

(2) Although the broker was willing to account as of the date of the contract, it could not be inferred that he waived his right to set off against profits previously acquired losses, if such should occur, on uncompleted transactions.

The contract above described provided that the salesman was "to have a drawing account of $100 per week, which shall be charged against his portion of said net profits, if any."  The salesman had drawn $1,500.  The decree of the Superior Court ordered him to repay this to the broker.  *Held,* that the decree in this respect must be reversed, as his right to retain what he drew was not dependent upon net profits afterwards being shown.

Two BILLS IN EQUITY, the first begun by a writ of summons and attachment in the Superior Court dated November 12, 1923, seeking an accounting by the defendant under an oral contract between the plaintiff as a salesman and the defendants as cotton brokers, described in the opinion, for a period from August 20, 1921, to October 6, 1921;  and the second, filed in the same court on November 28, 1923, seeking an accounting under the contract in writing dated October 6, 1921, described in the opinion, and also seeking a decree appointing a receiver to sell certain cotton purchased by the defendants before December 31, 1921, and still unsold in their possession.

Material provisions of the agreement in writing dated October 6, 1921, were as follows:

"1. To share equally the net profits made by the Foreign Department of said William Almy & Co. arising from purchases, sales, contracts or other dealings in Egyptian cottons and other cottons of foreign growth originating or consummated at any time during the balance of the calendar year 1921.

"2. Said net profits shall not be payable until all contracts for said cottons have been executed and collected by said William Almy & Co. and until after all charges against such sales have been received and all liabilities or guaranties thereon have been liquidated.

"3. Said Anagnosti is to have a drawing account of One Hundred Dollars ($100.00) per week, which shall be charged against his portion of said net profits, if any.

"4. Said William Almy & Co. will finance all said transactions.

"5. Said Anagnosti will not buy or sell cotton or any other commodity on his own account; and will not speculate in any manner whatsoever.

"6. Said Anagnosti will endeavor in all business transactions to maintain the high credit which said William Almy & Co. now possesses.

"7. Said Anagnosti will not knowingly commit said firm of William Almy & Co. to any liability within the scope of said contemplated business venture without first consulting with and obtaining the consent of said William Almy or some other duly authorized partner of said firm.

"8. Said Anagnosti shall be liable for and shall pay to said William Almy & Co. any and all losses that may arise from any unauthorized transactions.

"9. Said Anagnosti will devote during the business hours his whole time and best efforts to the business of said William Almy & Co. and he will not engage in any other business during the life of this agreement and he also agrees to hold as confidential the knowledge he obtains of the business of said firm and agrees not to disclose the same to any person or persons whatsoever at any time.

"10. This contract will terminate on December 31, 1921,

in so far as new undertakings in the purchase and sale of cotton are concerned, which said date coincides with the close of the partnership year of said William Almy & Co.

"11. Said Anagnosti has entered into this contract in the faith and expectation that he will become a general partner in William Almy & Co. from and after January 1, 1922; and it is agreed that unless said William Almy shall notify said Anagnosti to the contrary on or before said December 31, 1921, said Anagnosti shall become such a general partner in the firm of William Almy & Co., for the calendar year beginning January 1, 1922, shall be called upon to make such reasonable cash contribution to the capital of the firm as may be agreed upon between them, and shall be entitled to receive five per cent (5%) of the net profits from the domestic business and fifty per cent (50%) of the net profits of the foreign business in Egyptian cottons and other cottons of foreign growth transacted by said firm of William Almy & Co. in the calendar year 1922.

"12. Should it be decided to incorporate the business now carried on as William Almy & Co. to take effect at any time during said calendar year 1922, said Anagnosti shall, under the conditions hereinbefore written; namely, if said Almy has not notified him to the contrary as specified, or if he has in fact become a partner, be entitled to become an officer or stockholder of the corporation so formed upon such terms as will entitle him to receive approximately the percentages of net profits hereinbefore specified.

"13. The term net profits in this contract shall be taken to mean the profits remaining after all losses and expenses, including a proper charge for overhead, shall have been paid and in case of any doubt or dispute arising under this contract the question shall be settled by arbitration in the usual manner."

The suits were referred to the same master and afterwards were heard by *McLaughlin*, J., in the Superior Court on the master's report. Material findings by the master and findings and rulings by the judge are described in the opinion. By order of the judge, the interlocutory and final decrees

described in the opinion were entered. The plaintiff appealed from all decrees.

*C. E. Fay,* (*E. S. MacMillan* with him,) for the plaintiff.

*G. K. Gardner,* for the defendants.

CROSBY, J. These are two suits in equity for an accounting for profits under two agreements; the first is alleged to be oral while the second is in writing. The cases were referred to a master, who filed a single report to which both parties excepted and moved that it be recommitted. Upon hearing in the Superior Court, the judge denied these motions, overruled the plaintiff's exceptions, sustained the defendants' exceptions so far as they conformed to his order for decrees, and entered interlocutory and final decrees dismissing the first suit and ordering the plaintiff in the second suit to pay to the defendants the sum of $1,500 on the accounting with costs to the defendants in both suits. The cases are before this court upon the plaintiff's exceptions and appeal from all these orders and decrees; and upon the defendants' appeal from so much of the interlocutory decree as denies their motion to recommit, confirms the master's report, and fails to sustain all of their exceptions thereto. The evidence is not reported.

The plaintiff, an expert in Egyptian cotton, was for some years before September 7, 1921, employed in the foreign cotton department of E. A. Shaw and Company in Boston. On or about that date he severed his relations with that company, and as the result of negotiations with William Almy, senior member of the defendant firm, made an oral contract with the defendants to manage their foreign department, dealing especially in Egyptian cotton. The defendants agreed to pay him fifty per cent of the net profits of that department, to be determined when all losses and expenses including a proper charge for overhead had been deducted. He was to be allowed a drawing account of $100 a week which was to be charged against his share of the net profits, if any; he was not to be liable for losses sustained except as they might be deducted in the determination of the net profits. The arrangement was to continue until December 31, 1921, and the plaintiff was entitled to share

in the net profits on all business originating or consummated before that date. At the time this oral agreement was made the parties intended to reduce it to writing, but on the advice of counsel the plaintiff delayed so doing until his connections with E. A. Shaw and Company were closed by a final accounting and settlement; this was done on October 5. In the meanwhile the parties acted under the oral agreement. The day after his settlement with E. A. Shaw and Company, the plaintiff and his attorney conferred with the defendant Almy regarding the terms of the written contract; these were settled on October 8.

The master found that "The parties desired and intended to have their contract date back to the beginnings of their relation in September, but counsel advised that on account of the overlap of time with the plaintiff's relations with E. A. Shaw and Company it should not be done and both parties appear to have acquiesced in this advice . . . Mr. Barker [attorney for the defendant Almy] advised Mr. Almy that because the new contract was to be dated October 6, it would necessitate a separate accounting for the transactions already closed . . . . He then suggested that they have their accounting on those transactions at once, but the parties pointed out that this was not practical at that time because until all of the cotton sold had been delivered and the final payments made and charges and expenses determined, the net profits could not be ascertained, and the matter was dropped with the understanding that the accounting on these transactions would be had when it was convenient and practical for the parties." The written contract was actually executed on October 20, 1921. By reason of the defendants' objection to the report, the master added to the paragraph above quoted the following: "The parties intended the written contract of October 6 to supersede and take the place of the oral agreement previously existing between them, except as to those transactions which had been closed by purchases and sale prior to that date and concerning which they made the special oral agreement set forth."

The terms of the two contracts were substantially the same, with the addition in the written agreement of a pro-

vision by which the defendants were to take the plaintiff into their firm on January 1, 1922, unless they gave prior notice to the contrary. They did give such a notification, and the parties severed their relations on December 31, 1921.

The first suit is for an accounting for the period before October 6, and the second for the period from October 6 until December 31. It is the contention of the defendants that there should be a single accounting for the entire period. The master's finding, quoted above, was favorable to the plaintiff's contention that the accounting should be divided into the two periods. The court ruled, however, that this finding could not be supported and that the oral contract was binding for the entire period; that the written contract did not operate to terminate or merge the oral contract but was rather a permanent record of it. He further ruled that there was no certain and definite agreement to account separately for the transactions closed before October 6; that if such an agreement existed, it was parol and could not be admitted to vary or control the terms of the written contract, and that the account must be taken as a whole rather than in two parts. The plaintiff contends that accounts for each period should show a profit. The defendants admit that a profit is shown in the period from September 7 to October 6, but contend that the true account of the entire period from September 7 until December 31 shows a net loss of at least $240,000.

It appears by Exhibit 2, annexed to the master's report, that during the time the plaintiff was in the defendants' employ the latter contracted for the purchase of nine thousand and fifty bales of Egyptian cotton by thirty-one separate contracts; that during the same period they contracted to sell five thousand and fifty-three bales by nine separate contracts shown by the same exhibit. The purchases in excess of sales were three thousand nine hundred and ninety-seven bales, besides two contracts for the sale of fifteen hundred bales to one Brander which never were consummated, so that the defendants had five thousand four hundred and ninety-seven bales to dispose of after December 31, 1921. These bales were all sold before January 29, 1924, by thirty-five

sales contracts as shown by Exhibit 2.    The profits and losses resulting from all these transactions are involved in the present suits.

Between September 27 and October 6, 1921, the defendants purchased fifteen hundred bales of Sakel type of cotton in Alexandria for shipment to the United States, expecting that before its arrival the duty on such cotton would be removed.    Instead the duty was continued, and the cotton was diverted to Liverpool about November 1, 1921; the price declined materially thereafter and it ultimately was sold at a loss of $242,294.09.    The plaintiff had advised the defendants to protect themselves against this loss by "hedging."    The master finds that, as practised on the Liverpool exchange, hedging consists in selling contracts for the future delivery of cotton upon the exchange either with the idea of filling the contracts with the actual cotton on hand, or of offsetting any loss which may be incurred upon the sale of the actual cotton against a corresponding profit to be realized from the liquidation of the future contract.    He further found that the loss could have been lessened by hedging. The plaintiff contends that this transaction should not be included in the account because it was not contemplated by the contract, and also because the defendants refused to follow the plaintiff's advice as to hedging.    The master found in this connection that it was the intention of the parties to deal in foreign cotton in whatever manner might reasonably be expected to result in profitable transactions. The court ruled that the loss was to be included in the account.    There is nothing in the oral or written contract which requires the defendants to hedge or to buy or sell cotton on the plaintiff's advice or request.    On the contrary, it is expressly provided that all transactions were subject to the defendants' approval.    If the defendants did not deem it wise or expedient to trade on the Liverpool exchange, they were not required to do so.    They were not obliged to surrender their judgment to that of the plaintiff who assumed no responsibility for losses.

On November 27, 1923, a large amount of Egyptian cotton was still in the defendants' possession, a part of which had

been purchased while the plaintiff was in their employ. On that date the plaintiff demanded that all this cotton be sold by the defendants and accounted for forthwith. The defendants did not comply with that demand. Had the cotton then been sold on the Liverpool exchange for future delivery the gross profits would have been approximately $191,000. The master found that there was no reason for the defendants' failure to sell for future delivery in Liverpool at this time except the defendant Almy's expressed objection. The price realized from a subsequent sale yielded a profit of about $63,000. The plaintiff contends that the account should state the profits which a sale on November 27 would have realized rather than the actual profit. The court ruled that the actual profit was the amount for which the defendants were required to account. This ruling was correct. The record shows that the price declined from the time this cotton was bought in the fall of 1921; that until November, 1923, it could not have been sold at a price anywhere near what was finally obtained in January, 1924, when it was sold; and that during most of this period it could not have been disposed of except at a heavy loss. There is no evidence that the defendants acted fraudulently and it is expressly found by the master that they acted in entire good faith.

The foregoing rulings of the court resulted in the account showing a large loss on transactions after October 6, 1921, a loss far in excess of the profits gained before that date.

The defendants paid the plaintiff on his drawing account $300 during the first period, and $1,200 during the second; there were no profits against which those sums could be charged, and the final decree ordered the plaintiff to return them to the defendants.

As the evidence is not reported, the facts found by the master are conclusive unless on their face they are mutually inconsistent or plainly wrong. *Young* v. *Winkley*, 191 Mass. 570. *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 333, and cases cited. When, however, all the facts are documentary or are in a master's report, the court has the right to draw additional or different inferences of fact from the facts found. *Moore* v. *Rawson*, 185 Mass. 264. *American*

*Circular Loom Co.* v. *Wilson,* 198 Mass. 182, 200. *Caines* v. *Sawyer,* 248 Mass. 368, 376. In dealing with inferences of fact drawn by the trial judge from the master's report, this court stands with reference to the facts found and the power to draw inferences as did the trial judge, and is not bound by the findings made by him as all the facts are found in the report. *Glover* v. *Waltham Laundry Co., supra. Caines* v. *Sawyer, supra. Nichols* v. *Atherton,* 250 Mass. 215.

The rights of the parties are to be governed by the proper construction of the contracts made by them. If the oral contract is to be considered as separate and independent of the written agreement and the plaintiff is entitled to have separate accountings for the two periods, he is entitled to recover for a profit which accrued during the first period; if, on the other hand, there is to be a single accounting for the entire period, it is plain that as the business showed a large loss during the second period, there were no profits to account for. Notwithstanding the conclusion of the master upon this question, it is manifest that upon the reported facts the decision of the trial judge was correct in stating that "The writing . . . did not operate to terminate . . . the oral contract, but served rather as a convenient memorial or record of it, embodying the entire agreement of the parties, to be construed and interpreted, however, in the light of all the circumstances including the terms of the original oral agreement." Many facts support that conclusion. The oral agreement contained the specific provision that it was to extend until December 31, 1921. The written agreement by its terms was to expire on the same date. The parties intended from the beginning to reduce this oral agreement to writing. The provisions of each were substantially the same, with the addition in the written contract of the provision with reference to the plaintiff becoming a partner in the defendants' firm. The fact that the written agreement recited that it was made "as of the sixth day of October, 1921," is not conclusive upon the questions whether the oral agreement was terminated, or whether there were to be two separate periods of accounting. It is obvious from the findings that postponement in reducing the agree-

ment to writing and the provision that it should take effect on October 6 were only for the purpose of avoiding any difficulty because of the previous employment of the plaintiff by E. A. Shaw and Company, with whom on the day before he had come to a final settlement. Although there was talk of an accounting for the period before October 6, there was no rescission of the oral agreement; it still remained in force and neither party was released from the obligations which it imposed. The parties continued to act under it in all transactions which had originated before October 6 and were not completed until after that date. The provision in the written agreement that the parties should share in net profits originating or consummated "during the balance of the calendar year 1921" refers to the entire period from September 7 to December 31, rather than from October 6 to December 31. We reach this conclusion as a matter of construction, in view of the facts found and the reasonable inferences to be drawn therefrom. The effect of putting the contract in writing was merely to continue in force upon the same terms the previous oral agreement.

The facts found do not warrant the inference that there was a definite and clear understanding that the period of accounting, which otherwise would have extended from September 7 to December 31, should be divided into two periods, nor that in determining profits the transactions completed before October 6 should be separated from the others. Even if the defendants were willing to furnish the plaintiff with an account of transactions closed before October 6, there is no evidence to show and it cannot be inferred that they waived their right to set off losses, if such should occur, on uncompleted transactions against profits previously acquired. *Reardon* v. *Reardon,* 225 Mass. 255. *Lonnqvist* v. *Lammi,* 240 Mass. 371.

The reasonable inference from the facts found is that the conclusions of the court were warranted and must stand. It follows that, if an accounting for the entire period shows a loss, the plaintiff cannot recover. For reasons already stated the sale of cotton in Liverpool should be included in the ac-

count.   The contract did not allow the plaintiff the alternative of collecting profits if the defendants' business judgment were sound, but if it proved to be unsound to cancel losses.   The loss on the cotton on hand November 28, 1923, also should be included in the accounting: the defendants acted in good faith and were not chargeable with more than their share of the loss on this transaction, although they did not sell the cotton at so high a price as could have been obtained on that date.   To hold the defendants responsible because they did not sell the cotton on the Liverpool exchange at the highest price it reached during a period of nearly three years would impose a greater degree of prudence and foresight than is consistent with justice.   The plaintiff had no right to decide on what date this cotton should have been sold.   He is entitled only to profits actually received. Since the facts found, properly construed, provide for a single accounting for the entire period, and such accounting shows no profit but a large loss, it follows that the plaintiff cannot recover.

As the agreements provided that the plaintiff was to have a drawing account of $100 a week to be charged against his share of net profits, if any, and as there were no net profits he is not chargeable with the $1,500 drawn by him.

Whether the motions to recommit should have been allowed rested in the discretion of the court.   The final decree declaring that there is due from the plaintiff to the defendants the sum of $1,500 with costs of $17.50, and that said sums be paid to the defendants, is reversed.   The exceptions to the rulings and order of the court except as to the payment of $1,500 and costs to the defendants must be overruled. The interlocutory decrees and the final decree in the first suit in other respects are affirmed.   In the second suit, a final decree should be entered dismissing the bill.

*Ordered accordingly.*